769 A.2d 962

**SOUTHERN MANAGEMENT CORPORATION,**

v.

**Mukhtar TAHA.**

**No. 75, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 3, 2001.

698

700

Stephen M. Silvestri (Lisa F. Orenstein and Miles & Stockbridge, P.C., on the brief), Baltimore, for appellant.

Hannibal G. Kemerer (John W. Hermina, George W. Hermina, Hermina Law Group, Laurel, and Forest E. Mays, Annapolis, on the brief), for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

In this case, we must consider whether a jury's verdict finding a corporate employer liable for malicious prosecution is fatally inconsistent with its verdict exonerating two corporate employees. The appeal arises from a suit filed in the Circuit Court for Montgomery County by Mukhtar Taha, appellee, against his former employer, Southern Management Corporation ("Southern"), appellant, and two former co-employees, Deborah Wylie–Forth and Michael McGovern,[1] following

---

1. We note that, in its brief, Southern has occasionally spelled the name of its employee as "Debra Wiley–Forth." We have utilized the spelling

Taha's discharge from his position at Southern. Taha claimed, *inter alia*, that Southern and the two individual employees committed the tort of malicious prosecution by filing unfounded burglary charges against him. The jury found in favor of the individual employees but against Southern. After the court denied appellant's Motion for Judgment Notwithstanding the Verdict ("JNOV"), this appeal followed.[2]

Southern presents four questions for our consideration, which we have rephrased slightly:

I. Because the jury found that Southern's agents were not liable for the tort of malicious prosecution, did the circuit court err in denying Southern's Motion for Judgment Notwithstanding the Verdict as to the claim for malicious prosecution?

II. Did the circuit court err in refusing to instruct the jury that it must find actual malice in order to award punitive damages?

III. Did the circuit court err in denying Southern's motion to strike punitive damages because there was no evidence of actual malice in the record to support the award?

IV. Did the circuit court err in denying Southern's motion for remittitur as to the jury's award of $25,000 for economic damages, because appellee sustained only $500 in such damages?

For the reasons that follow, we answer question I in the affirmative. Therefore, we shall reverse the judgment. Accordingly, we need not answer the remaining questions.

## FACTUAL BACKGROUND

Taha is a black male who emigrated to the United States in 1981 from Africa. On May 15, 1994, Southern hired Taha to

---

provided by Wylie–Forth in an affidavit submitted by her in pre-trial proceedings.

**2.** Appellee did not file a cross-appeal in connection with the jury's verdict in favor of the individual defendants. Therefore, they are not parties to this appeal.

work as a Maintenance Technician at Silver Spring Towers ("SST"), an apartment complex managed by Southern. Taha's duties included attending to service calls and undertaking repairs and renovations.

After five months of employment, Southern terminated Taha on October 19, 1994. Six days later, on October 25, 1994, Taha was arrested at his apartment in the presence of his family. Taha's daughter was "devastated" and "fell on the floor crying." Taha's wife was also crying. The charging documents alleged a second degree attempted burglary of Southern's maintenance shop on October 4, 1994, and a fourth degree burglary of a Southern storehouse on October 8, 1994. The dismissal of the charges against Taha gave rise to the civil suit filed by him on March 3, 1999, against Southern, Mc-Govern, and Wylie–Forth, alleging wrongful discharge, malicious prosecution, conspiracy, false imprisonment, defamation, and intentional infliction of emotional distress. Southern and the two individual defendants were all represented by the same legal counsel.

Prior to trial, by order dated May 27, 1999, the circuit court dismissed all but two of Taha's claims. At the close of Taha's case, the circuit court entered judgment in favor of the defense as to the claim for intentional infliction of emotional distress, leaving only the claim for malicious prosecution.[3] What follows is a summary of the evidence adduced at trial relevant to the malicious prosecution claim.

While at SST, Taha worked under the supervision of Mc-Govern, who managed the maintenance employees at the complex. McGovern was the only white employee at SST among 30 or more employees. McGovern reported to Wylie–Forth, a black female who was the Property Manager of the apartment complex. McGovern and Wylie Forth had worked together for over 10 years.

---

3. Taha has not filed a cross-appeal regarding the dismissal of the other claims.

Taha alleged that he was implicated in two burglaries at Southern because of his poor working relationship with McGovern and Wylie–Forth. He claimed that within several weeks after he began working at SST, McGovern and Wylie–Forth were unhappy with his job performance and indicated that he needed to be more of a "team player." Wylie–Forth also disliked Taha's abrasive conduct and advised Taha that he needed to cooperate with the other employees. Taha believed, however, that his job performance was adequate, and felt that he had been criticized unfairly because McGovern and Wylie–Forth did not like him.

At trial, Taha recounted that McGovern complained to Wylie–Forth "[a]lmost every day" about Taha's performance. Taha also stated that McGovern singled him out and complained about "the smallest stuff," such as the length of his hair. Additionally, Taha testified that McGovern made derogatory remarks to him about Africans and African–Americans, describing them as "lazy" and "stupid." According to Taha, McGovern once "took off his shirt, rolled it off and throw [sic] it on my face. He said to me, 'Do you want to be a supervisor?' and he gave me—he throw his shirt on my face like that." Further, Taha believed that McGovern and other employees, including Wilfredo Martinez, purposely attempted to injure him by letting go of a heavy barrel that they were attempting to move.

Taha testified that on three or four occasions he complained to Wylie–Forth about McGovern's racial comments. According to Taha, Wylie–Forth was unresponsive and told him that he complained "like a child." When Taha told Wylie–Forth about the shirt incident, she remarked: "Mike have short temper [sic]. Just bear with him, and as soon as you finish your training period, you are going to be transferred and you are going to be okay."

On or about October 5, 1994, McGovern sent a memorandum to Wylie–Forth implicating Taha in an attempted burglary of one of Southern's maintenance shops. The memorandum said:

DEAR DEBRA [sic]:

THIS LETTER IS WRITTEN TO BRING TO YOUR ATTENTION AN INCIDENT RELAYED TO ME BY ONE OF THE MAINTENANCE WORKERS, WILFREDO [MARTINEZ]. WILFREDO REPORTED TO ME THAT WHILE WALKING TO HIS CAR HE OBSERVED TAHA TRYING TO BREAK INTO THE MAINTENANCE SHOP ON OCTOBER 4, 1994 AT APPROXIMATELY 8:30 PM. WILFREDO OBSERVED TAHA SHAKING AND PULLING ON THE LOCK AFTER HIS KEY DID NOT OPEN THE DOOR. WHEN WILFREDO ASKED "WHAT ARE YOU DOING HERE?", TAHA REPLIED "I DO NOT HAVE THE KEY TO THIS DOOR".

WILFREDO SHARED THIS SCENARIO WITH ME BECAUSE OF HIS CONCERN THAT RECENTLY A MULTITUDE OF MATERIALS HAVE DISAPPEARED FROM THE MAINTENANCE SHOP AND COULD NOT BE ACCOUNTED FOR. THIS IS NOT ONLY A CONCERN OF WILFREDO'S BUT HAS BEEN AN ONGOING CONCERN OF ALL MAINTENANCE WORKERS. WILFREDO COULD NOT UNDERSTAND WHY TAHA WOULD BE INTENT UPON ENTERING THE MAINTENANCE SHOP WHILE ON MEDICAL LEAVE. WILFREDO THEN LEFT THE SCENE AND REPORTED THE INCIDENT TO ME THE NEXT MORNING.

A few days later, Wylie–Forth learned that property had been removed from a locked storage area containing Southern's maintenance supplies and tools. Consequently, she called the Montgomery County Police Department to report the missing property.

At trial, Wylie–Forth testified as an adverse witness and also in the defense case. When asked if she had called the police to report the missing property, Wylie–Forth initially said: "No. Someone in my office called the police." When asked again, she replied: "I can't remember." When asked a third time, Wylie–Forth admitted: "Yes, I called the police." Later, she said: "I did not call the police on Mr. Taha." In

response to a question from her lawyer, Wylie–Forth explained: "[I]n my business anytime you have any type of an incident where something is stolen . . . or broken into, you are supposed to call . . . the . . . police."

On October 23, 1994, Robert Grims, a Montgomery County Police Officer, responded to the call about missing property. Although Wylie–Forth advised him that several expensive tools were missing, she did not identify any suspects. Nevertheless, in response to Grims's inquiry, Wylie–Forth identified Taha as an employee who had recently been terminated, and said that two of her maintenance workers reported that Taha had been seen at SST. She also informed Grims that she and Taha had argued after his termination. Additionally, Wylie–Forth gave permission to Grims to talk to any of Southern's employees about the matter.

Grims spoke to McGovern, who informed Grims that his tools were missing from the storage room. Although McGovern did not identify Taha as a suspect, he told Grims that Taha and Wylie–Forth had argued following Taha's termination, and that McGovern believed that Taha still had keys to the storage area. During Grims's investigation, he also interviewed Wilfredo Martinez and Anna Udit, two other Southern employees. Neither Martinez nor Udit testified at trial.[4]

Grims also interviewed Taha at his apartment, and Taha denied knowledge of the burglaries. Although Taha indicated that he still had keys to several rooms in the apartment complex, Taha claimed he did not have keys to the areas in question. Grims noticed several large tool boxes on the floor of Taha's apartment, but Taha indicated that those tools belonged to him.

Based on Grims's investigation, Grims completed an Application for Statement of Charges, charging Taha with second degree attempted burglary of the maintenance room at SST,

---

**4.** In his brief, Taha notes that Southern served a subpoena on Udit but did not call her as a witness. The record does not reflect the unavailability of either Udit or Martinez, nor are we aware of any effort by Taha to call Udit or Martinez as witnesses.

and fourth-degree burglary of the main office at SST. Grims also obtained a warrant for Taha's arrest.

According to the Application For Statement Of Charges, Martinez reported to Grims that he had observed Taha "shaking and pulling on the lock" in the maintenance shop of SST on Saturday evening, October 4, 1994, and Taha "fled" when confronted by Martinez. Wylie–Forth learned about the incident from Martinez, after various items had "disappeared" from the maintenance shop. At the time, Taha was on disability leave and had no right of access to the SST property. In addition, according to the Application, Udit informed Grims that she had observed Taha in Wylie–Forth's office on October 8, 1994, while Taha was still on medical leave. Nevertheless, Grims said at trial that he was the one who decided to bring charges against Taha, notwithstanding that he had obtained information concerning Taha from Southern's employees. The following trial testimony is relevant:

[APPELLANT'S ATTORNEY]: Who made the decision to file the application for statement of charges against Mr. Taha?

[GRIMS]: It was my decision.

[APPELLANT'S ATTORNEY]: What if any role did Mr. McGovern, Michael McGovern, play in making that decision?

\* \* \*

[GRIMS]: No role.

[APPELLANT'S ATTORNEY]: What if any role did Ms. Debbie Wiley–Forth [sic] play in making your decision to file the application for statement of charges?

[GRIMS]: She was the original complainant for the police investigation, however, it was my decision to file the charges.

[APPELLANT'S ATTORNEY]: At any point in time, what if anything did Ms. Debbie Wiley–Forth [sic] say to you to encourage you or pressure you into filing charges for Mr. Taha?

[GRIMS]: None that I recall.

[APPELLANT'S ATTORNEY]: What if anything did Mr. McGovern say to you to pressure you or get you to file an application of statement of charges against Mr. Taha?

[GRIMS]: Nothing.

On cross-examination, the following testimony was elicited:

[APPELLEE'S ATTORNEY]: Who was the complainant in this case?

[GRIMS]: Ms. Forth.

[APPELLEE'S ATTORNEY]: Who does she work for?

[GRIMS]: Southern Management.

[APPELLEE'S ATTORNEY]: Did she ever tell you that she wasn't authorized to about this to you [sic]?

[GRIMS]: No. I can't recall that.

[APPELLEE'S ATTORNEY]: Did anybody ever say from Southern Management Corporation that they weren't authorized to make any statements to you, that they needed to talk to corporate counsel before they could make a statement to you?

[GRIMS]: No.

[APPELLEE'S ATTORNEY]: So the investigation really originated with Southern Management employees. Isn't that correct?

[GRIMS]: Yes.

[APPELLEE'S ATTORNEY]: Ms. Debra Wiley–Forth [sic], is she the one who called you on the phone?

[GRIMS]: She was the initial complainant to one of the burglaries.

\* \* \*

[APPELLEE'S ATTORNEY]: ... Did you speak to Michael McGovern, then?

[GRIMS]: I can't recall. I believe I did, but I am not positive.

\* \* \*

[GRIMS]: ... I know I spoke with Mr. Martinez. I can't recall speaking with Mr. McGovern.

\* \* \*

[GRIMS]: I probably was speaking to him. I just don't remember speaking to him.

\* \* \*

[GRIMS]: I interviewed Ms. Hudit [sic] and Mr. Martinez.

\* \* \*

[APPELLEE'S ATTORNEY]: Apparently, you say all of the victims, and I assume Mr. McGovern is one of the victims since you list him as a victim, indicated that items began disappearing ever since Mr. Taha was working there?

[GRIMS]: Yes. That is in there.

\* \* \*

[APPELLEE'S COUNSEL]: Would it be fair to say that the information that you got regarding the whereabouts or any behavior or observations of Mr. Taha came from Southern Management employees?

[GRIMS]: Yes.

After Taha's arrest on October 25, 1994, he was released on his own recognizance. Taha maintained that, on the dates of the two alleged burglaries, he was in New York, and thus could not have committed the crimes. He also produced documentary evidence to support his assertion that he was in New York on October 2, 1994, and October 8, 1994. Taha's account was corroborated by his wife and a customer service representative who worked at the Greyhound bus terminal in Silver Spring.

Taha recounted to the jury that the criminal charges were eventually dismissed. He recalled that the prosecutor stated in court: "This guy he have an air-tight alibi, and we cannot prosecute him." The record reflects that, on January 10, 1995, the criminal case against Taha was placed on the "stet" docket for one year. Thereafter, a nolle prosequi was entered

on January 11, 1996. According to Taha, he incurred $500 in legal fees in connection with the criminal charges.

At the end of Taha's case, the court ruled on the defense motions for judgment, and said: "With respect to individual liability, it is clear that a corporate entity acts through its agents, but that doesn't eliminate the possibility of agent/individual liability." As we noted, the court granted the motion as to the claim for intentional infliction of emotional distress.

In its initial instructions to the jury, the court never addressed or explained the concept of respondeat superior liability. At the end of the instructions the court said: "Anything further, Counsel?" Appellee's counsel answered "yes." Then, counsel approached the bench, but the trial transcript indicates that the bench conference was "inaudible." In any event, after the bench conference the court gave several clarifying instructions. Of significance here, the court gave the following supplemental instruction:

> In this matter, the defendants are sued as employer and employee, so the management may be employer and co-defendant, and the *employees, being Mr. McGovern and Ms. Wiley,* for them.
>
> If the employee or employees are responsible for the acts about which the complaint is made by the plaintiff, the employer is also responsible since they would have been acting in the course of their employee responsibilities.

(Emphasis added). No objection was lodged to that instruction, nor was any request made for further amplification of the doctrine of respondeat superior.

After presenting closing arguments, the lawyers discussed the proposed verdict sheet. Southern's lawyer identified as a "problem" that it included only one question that pertained to all three defendants.[5] Therefore, he asked the court to submit a special verdict sheet containing a separate question "with respect to each individual defendant." No objection or excep-

---

**5.** We cannot find in the record the exact text of the original verdict question.

tion was interposed by counsel for appellee with regard to Southern's request. Accordingly, the special verdict sheet included separate questions as to liability for each defendant, phrased as follows:

1. Was the Plaintiff, Mukhtar Taha, the victim of malicious prosecution by the Defendant Southern Management Corporation?

2. Was the Plaintiff, Mukhtar Taha, the victim of malicious prosecution by the Defendant, Deborah Wylie–Forth?

3. Was the Plaintiff, Mukhtar Taha, the victim of malicious prosecution by the Defendant, Michael McGovern?

If "Yes" to any Defendant, answer Question 4.

4. What amount of damages do you award Plaintiff?

 A. Economic $ _____

 B. Non–Economic $ _____

Appellee did not object to the wording of the questions, nor did he ask the court to make clear in Question 1 that Southern's liability, if any, necessarily rested on the conduct of one or more of its employees acting within the scope of employment.

As we noted, the jury found against Southern but exonerated the individual defendants. It awarded Taha $100,000 in compensatory damages, consisting of $25,000 for economic damages and $75,000 for non-economic damages. Thereafter, the court submitted the issue of punitive damages to the jury. With respect to punitive damages, the court instructed the jury as follows:

Mr. Foreman, ladies and gentlemen of the jury, there is an additional consideration that you must make, but you are not required to. It is fundamental that you make a determination with respect to liability; that is compensatory damages, but you may make an award for punitive damages if you deem appropriate.

An award for punitive damages, if you decide to award punitive damages, must be established by clear and convinc-

ing evidence, and I am going to define what clear and convincing evidence is.

To be clear and convincing, evidence should be clear in the sense that it is certain, plain to the understanding and unambiguous and convincing in the sense that it so reasonable [sic] and persuasive as to cause you to believe it. But you need not be convinced beyond a reasonable doubt; only to clear and convincing evidence.

An award of punitive damages, I indicated, must be established by clear and convincing evidence, and for an award of punitive damages to be made, you should consider the following thee factors: in an amount that will deter the defendant and others from similar conduct in the future; two, proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay; and three, but not designed to bankrupt or financially destroy a defendant. As I indicated earlier, you may, if you deem it appropriate, award for punitive damages, but you are not required to.

Because Southern believed that the court did not adequately instruct the jury on the element of "actual malice," Southern objected and asked the court to "instruct [the jury] that there needs to be actual malice." The court refused to modify its instruction, reasoning that the jury does

not even have to award punitive damages. I said they may, but they are not required to do so—malice—malicious prosecution, I do not think I have to—they have determined that there is malice by their verdict already.

Thereafter, the jury awarded Taha $100,000 in punitive damages.

Subsequently, Southern moved for JNOV, claiming that, as a matter of law, it could not be liable for malicious prosecution because the jury exonerated the two individual defendants who were employees of Southern and who committed the conduct at issue. Although the court acknowledged that the verdict appeared "on the surface to be factually inconsistent," it denied the motion.

We shall include additional facts in our discussion.

## DISCUSSION

### I. STANDARD OF REVIEW

██ "In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2–532(a); *see* Md. Rule 2–519. An appellate court considering the denial of a motion for JNOV must determine whether the record contains legally relevant and competent evidence, however slight, from which a jury rationally could have found in appellee's favor. *Jacobs v. Flynn*, 131 Md.App. 342, 353, 749 A.2d 174 (2000); *Bartholomee v. Casey*, 103 Md.App. 34, 51, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995).

██ In our review of the trial court's decision, we consider the evidence, and all reasonable inferences that may be drawn from that evidence, in the light most favorable to the party in whose favor the verdict was rendered. Md. Rule 2–519(b); *Houston v. Safeway Stores, Inc.*, 346 Md. 503, 521, 697 A.2d 851 (1997); *Caldor, Inc. v. Bowden*, 330 Md. 632, 636, 625 A.2d 959 (1993); *Jacobs*, 131 Md.App. at 353, 749 A.2d 174. Moreover, all evidentiary conflicts are resolved in favor of the party who prevailed below. *Caldor*, 330 Md. at 636, 625 A.2d 959; *Miller Bldg. Supply, Inc. v. Rosen*, 61 Md.App. 187, 193, 485 A.2d 1023 (1985), *aff'd*, 305 Md. 341, 503 A.2d 1344 (1986). On the other hand, we will reverse a trial court's denial of a motion for JNOV when the verdict is unsupported by the evidence or legally flawed. *See Lusby v. First Nat'l Bank*, 263 Md. 492, 506, 283 A.2d 570 (1971); *Piquette v. Stevens*, 128 Md.App. 590, 598, 739 A.2d 905 (1999), *cert. granted*, 357 Md. 481, 745 A.2d 436 (2000). "If . . . the evidence as a whole does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty, then the denial of [the] motion [ ] for judgment or JNOV was error." *Bartholomee*, 103 Md.App. at 51, 651 A.2d 908; *see Campbell v. Baltimore Gas and Elec. Co.*, 95 Md.App. 86,

95, 619 A.2d 213 (1993), *cert. denied*, 331 Md. 196, 627 A.2d 538 (1993).

▮▮▮ The parties have not referred us to the law that generally governs inconsistent verdicts, but we believe that it is useful to review the fundamental principles. " 'Inconsistent jury verdicts are generally not sufficient grounds for an appellate court to reverse a jury verdict' unless there is proof of 'actual irregularity.' " *Davis v. Goodman*, 117 Md.App. 378, 423, 700 A.2d 798 (1997); *see Zachair, Ltd. v. Driggs*, 135 Md.App. 403, 440 n. 17, 762 A.2d 991 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 54 (filed March 9, 2001). " 'That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.' " *Zachair*, 135 Md.App. at 441 n. 17, 762 A.2d 991 (citations omitted).

▮▮▮ Ordinarily, we accord great deference to a jury verdict. We have stated that a

"jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance is unquestioned. The members of the jury see and hear the witnesses as they testify. They watch them as they sweat, stutter or swagger under the pressure of cross-examination."

*Adams v. Owens–Illinois, Inc.*, 119 Md.App. 395, 408–09, 705 A.2d 58 (1998)(quoting *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 522, 682 A.2d 1143 (1996)). Similarly, "[i]n reconciling a jury's answers to specific interrogatories, we should assume that the jury was rational and consistent, rather than irrational or inconsistent. Our quest should be for a view of the case which would make the jury's findings consistent." *Edwards v. Gramling Eng. Corp.*, 322 Md. 535, 547–48, 588 A.2d 793 (1991), *cert. denied*, 502 U.S. 915, 112 S.Ct. 317, 116 L.Ed.2d 259 (1991); *see JGB/Twinbrook Metro Ltd. P'ship v. Wheeler*, 346 Md. 601, 621, 697 A.2d 898 (1997)(stating that an " 'appellate court must view a case in a way that reconciles the jury's verdicts if at all possible.' " (citation omitted)); *Lyon v. Campbell*, 120 Md.App. 412, 443,

707 A.2d 850, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998). On the other hand, verdicts that are "irreconcilably inconsistent," *Davis,* 117 Md.App. at 424, 700 A.2d 798, or "irreconcilably defective," *Adams,* 119 Md.App. at 408, 705 A.2d 58, may be subject to defeat.

What we said in *Food Fair Stores, Inc. v. Lascola,* 31 Md.App. 153, 167, 355 A.2d 757 (1976), is pertinent here: "The fact of inconsistency between one verdict and another returned by the same jury does not automatically make either verdict illegal." Rather, an irreconcilably defective verdict occurs " '[w]here the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict for the defendant.' " *Davis,* 117 Md.App. at 424, 700 A.2d 798 (quoting *S & R, Inc. v. Nails,* 85 Md.App. 570, 590, 584 A.2d 722 (1991), *judgment vacated on other grounds,* 334 Md. 398, 639 A.2d 660 (1994)); *see Adams,* 119 Md.App. at 408, 705 A.2d 58.

## II.

Appellant alleges that the circuit court erred in denying Southern's motion for JNOV. Because the jury exonerated Southern's two employees, who were the alleged tortfeasors, Southern contends that the corporation could not be liable as a matter of law. Appellee counters that Southern has waived its argument about an inconsistent verdict, because it failed to object to the verdict sheet. Taha also contends that the circuit court properly denied Southern's motion because other employees of Southern, in addition to the two who were sued, gave false information about Taha to the police, and their tortious conduct was attributable to Southern. Further, Taha asserts in his brief that "nowhere in the Complaint is Mr. Taha arguing derivative liability under a theory of respondeat superior." Instead, he claims that Southern is directly and independently liable for its own tortious conduct.[6]

---

6. As we discuss, *infra,* appellee proceeded at trial on the theory that Southern was liable based on the conduct of the two employees who

## A.

According to Taha, the verdict sheet was prepared pursuant to appellant's request, and the verdict sheet gave "the jury ... the impression that it could assign liability to the corporate entity and extend clemency to the individual defendants." In Taha's view, if there is any issue about an inconsistent verdict, it is due to the form of the verdict sheet, which Southern requested. Therefore, Taha argues that "it would be improper to continence [sic] [appellant's] newly asserted arguments that the Jury's Verdict is somehow inconsistent." As we understand it, Taha essentially argues that it would be unfair to allow Southern to benefit from a problem that it created with respect to the verdict sheet.

In support of Taha's claim of waiver, he relies on *Wright v. Eagle–Picher Indus., Inc.* 80 Md.App. 606, 565 A.2d 377 (1989). Taha's reliance on *Wright* is misplaced. There, pursuant to Md. Rule 2–522(c), the Court determined that the defendants waived their right to have the jury determine a particular issue, because they failed to object to the *omission* of the issue from the verdict sheet. Here, appellant is not complaining about the omission of an issue from the verdict sheet. Rather, Southern's argument is premised on its claim that the jury's exoneration of the individual tortfeasors compels a finding in its favor, as a matter of law.

To be sure, Southern did not object to the form of the verdict sheet that was tailored to its request. To the contrary, it asked the court to pose separate questions pertinent to each defendant. *See* Md. Rule 2–522. But, Southern maintains that the issue is the verdict, not the verdict sheet, and claims that it challenged the verdict at the earliest opportunity through its motion for JNOV. Therefore, Southern

---

were sued. In our view, that is a derivative claim against Southern, founded on the doctrine of respondeat superior. Moreover, Taha has not pointed us to any authority in support of the assertion that Southern may be held independently liable for the tort of malicious prosecution.

contends that it has preserved this issue for appeal. We agree with appellant.

Following the bench conference, the jury was specifically instructed that, "[i]f the employee or employees are responsible for the acts about which the complaint is made by the plaintiff, the employer is also responsible since they would have been acting in the course of the employee responsibilities." That supplemental instruction was accurate but arguably incomplete and, as a result, possibly misleading. Although the court specifically told the jury that Southern would be liable if the jury found McGovern and Wylie–Forth liable, the court never advised the jury of the converse-that Southern's liability, if any, is founded on the conduct of its employees, and if the jury exonerated the two named employees, Southern could not be liable. Even if liability could attach based on the conduct of other employees of Southern who were not sued, the jury was not instructed to consider the conduct of other employees. Significantly, Taha never asked the court to amplify its supplemental instruction, nor did he object or except to it as inadequate.

Moreover, we cannot find fault with the defense for requesting a separate verdict question for each defendant. Md. Rule 2–522(c) provides, in part, that "[t]he court may require a jury to return a special verdict in the form of written findings upon specific issues." Moreover, the Court of Appeals has recognized that "special verdicts are often useful in cases with multiple parties or issues." *Owens–Corning Fiberglas Corp.,* 343 Md. at 525, 682 A.2d 1143. In the absence of an abuse of discretion, we will not reverse a trial court's "use of a particular form for special verdicts." *ACandS v. Abate,* 121 Md.App. 590, 628, 710 A.2d 944, *cert. denied sub nom., John Crane, Inc. v. Abate,* 350 Md. 487, 713 A.2d 979 (1998), *cert. denied,* 525 U.S. 1171, 119 S.Ct. 1096, 143 L.Ed.2d 95 (1999). Here, the individual defendants were certainly entitled to separate consideration by the jury with regard to their conduct and culpability. Although the issue that has now arisen could have been avoided by a carefully worded verdict ques-

tion as to Southern, Taha did not object to the form of the question. Therefore, he is the one who waived a complaint about its sufficiency. Nor is there any basis to conclude that appellant's counsel deliberately sought to create confusion. But, when the issue arose after the jury rendered its verdict, Southern promptly raised the contention that the finding of liability against it could not stand.

We turn to consider whether the court erred by denying appellant's motion for JNOV.

### B.

Corporations act through their agents. *Athas v. Hill,* 300 Md. 133, 149, 476 A.2d 710 (1984). Under the doctrine of respondeat superior, an employer is jointly and severally liable for the torts committed by an employee acting within the scope of employment. *Oaks v. Connors,* 339 Md. 24, 30, 660 A.2d 423 (1995); *see DiPino v. Davis,* 354 Md. 18, 47, 729 A.2d 354 (1999); *Tall v. Bd. of School Comm'rs of Baltimore City,* 120 Md.App. 236, 251, 706 A.2d 659 (1998). The " 'master is [also] liable for the acts which his servant does with the actual or apparent authority of the master . . . or which the master ratifies with the knowledge of all the material facts.' " *Dhanraj v. Potomac Elec. Power Co.,* 305 Md. 623, 627, 506 A.2d 224 (1986) (citation omitted). Thus, an employer can be liable for the tort of malicious prosecution committed by its employees, based on principles of respondeat superior or vicarious liability. As the Court said in *Ace Dev. Co. v. Harrison,* 196 Md. 357, 365, 76 A.2d 566 (1950), "[a] corporation, operating through its agents within the scope of their authority within corporate power, is liable for its acts the same as is a natural person." *See Oaks,* 339 Md. at 30, 660 A.2d 423; *Lovelace v. Anderson,* 126 Md.App. 667, 681–82, 730 A.2d 774, *cert. granted,* 355 Md. 610, 735 A.2d 1105 (1999); *Tall,* 120 Md.App. at 251, 706 A.2d 659; *Sheets v. Chepko,* 83 Md.App. 44, 46–47, 573 A.2d 413, *cert. denied,* 320 Md. 800, 580 A.2d 219 (1990).

■ To prevail in a suit for malicious prosecution, a plaintiff must prove that: (1) a criminal proceeding was instituted against the plaintiff by the defendant; (2) the criminal proceeding was resolved in the accused's favor; (3) the defendant did not have probable cause to institute the proceeding; and (4) the defendant acted with malice, " 'or a primary purpose in instituting the proceeding other than that of bringing an offender to justice.' " *Caldor, Inc.,* 330 Md. at 656, 625 A.2d 959 (quoting *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978)); *see Okwa v. Harper,* 360 Md. 161, 183, 757 A.2d 118 (2000); *DiPino,* 354 Md. at 54, 729 A.2d 354; *One Thousand Fleet Ltd. P'ship v. Guerriero,* 346 Md. 29, 37, 694 A.2d 952 (1997); *Green v. Brooks,* 125 Md.App. 349, 367, 725 A.2d 596 (1999).

*Picone v. Talbott,* 29 Md.App. 536, 349 A.2d 615 (1975), illustrates that a principal may be liable for the tort of malicious prosecution based on the conduct of an agent. There, a daughter handled the leasing arrangements for an office building owned by her mother. After the daughter leased the premises to a certain company, disputes arose between the daughter and that company, and the daughter eventually obtained arrest warrants for two company officials. One of the company officials was acquitted, and he subsequently sued the daughter and the mother, both of whom were found liable. On appeal, we determined that the evidence was sufficient to support the findings, based on the relationship of principal and agent between mother and daughter. We stated: " 'If the prosecution was previously authorized or subsequently ratified, or if within the scope of the servant's or agent's employment, the employer or principal is liable; *otherwise he is not.'* " *Picone,* 29 Md.App. at 541, 349 A.2d 615 (quoting *Nance v. Gall,* 187 Md. 656, 671, 51 A.2d 535 (1947), *overruled on other grounds, Embrey v. Holly,* 293 Md. 128, 442 A.2d 966 (1982)) (emphasis added). In this case, however, we are confronted with the converse situation. The question here is whether the principal may be liable if the agent is found not liable.

Taha asserts that "the intentional tort of malicious prosecution may be brought against the employer directly so long as the [tortfeasor-]employee is acting within the scope of his employment." For its part, Southern concedes that, under certain circumstances, a corporate employer could be liable for the tort of malicious prosecution, based on the conduct of an employee, even if the tortfeasor-employee is not sued by the plaintiff. In the context of this case, however, in which two employees were sued, Southern maintains that the jury's favorable disposition as to those two employees required a finding in its favor. Appellant explains that, based on well-established principles of respondeat superior, Southern, as principal, cannot be liable here, because the two employee-defendants were found not culpable, *and* the evidence did not show that any other corporate employees committed the tort. Moreover, appellant maintains that the jury was never asked to consider, and did not decide, if Southern was liable based on the conduct of other employees who were not actually sued. In sum, because respondeat superior liability is derivative, Southern maintains that it cannot be liable for the actions of two named employees whose conduct was not found wrongful by the jury.

We agree that, in order to prevail in a claim against Southern for malicious prosecution, Taha was not obligated to sue the individual employees who allegedly committed the tort. Instead, Taha could have sued Southern alone, and established liability based on the conduct of one or more of its employees who were acting in the scope of employment. Regardless of whether Taha elected to sue the individual tortfeasors, Taha still had to prove that his injury was caused by an agent or employee of Southern, acting in the scope of employment, in order to prevail against Southern. *See generally Tall*, 120 Md.App. at 251, 706 A.2d 659.

Here, appellee elected to sue both the corporation and two of its employees as wrongdoers. Consequently, we must determine whether Taha proceeded on the basis that the named individual employees were the ones who committed the

tort and, if so, whether the verdicts against Southern can stand, given that the jury found that the two employees were not liable.

Taha seems to suggest that the verdict was not flawed because the jury could have decided, in its discretion, only to hold the corporate defendant responsible for the conduct of Wylie–Forth and McGovern, rather than hold the two employees personally responsible for their tortious conduct. Taha has not referred us to any legal authority to support that proposition, however. Moreover, it flies in the face of settled law.

A general rule of substantive law is that a corporation, like an individual, is liable for its torts, unless otherwise exempt by law. *By itself, however, a corporation is a fictional person incapable of tortious conduct,* and, being a de jure person, cannot by itself have a mental state of any kind, and for this reason, *can only have, and be liable for, the mental states of its various employees, when they act within the authority given to them.*

19 C.J.S. *Corporations* § 699, at 352 (1990) (emphasis added).

*DiPino,* 354 Md. 18, 729 A.2d 354, is instructive. There, after the State dismissed criminal charges against Davis for hindering and obstruction, Davis brought a civil suit against the detective who filed the charges, claiming, *inter alia,* malicious prosecution. Davis also sued the officer's employer, the Mayor and City Council of Ocean City, based on vicarious liability. After the trial court ruled in favor of the defendants, Davis appealed. In the course of its opinion, the Court said:

When acting in a private or proprietary context, the entity also has *respondeat superior* liability for the tortious conduct of its employees. Because that liability is derivative, however, *recovery may not be had against the entity if the employee is found not to be liable* or is released.

*Id.* at 47–48, 729 A.2d 354 (emphasis added). *See Barone v. Winebrenner,* 189 Md. 142, 146–47, 55 A.2d 505 (1947) (concluding that owner of vehicle was not liable for accident when the driver was found not liable); *see also Leimbach v. Bick-*

*ford's, Inc.* 214 Md. 434, 135 A.2d 633 (1957); *Lovelace,* 126 Md.App. at 707, 730 A.2d 774 (concluding that because there was no liability on the part of the employee, "it follows that, as a matter of law, there can be no liability on the part of his employers ... under the doctrine of respondeat superior.").

Other jurisdictions adhere to the view that tort liability for malicious prosecution is imputed to a principal based on the conduct of its agent or employee, and that the exoneration of the alleged individual tortfeasor relieves the principal of liability. For example, in *Mann v. Wadsworth,* 776 P.2d 926 (Utah App.1989), the appellant sued a law firm and its client for malicious prosecution in bringing a conspiracy suit against the appellant. The law firm was dismissed from the action and a judgment was rendered in favor of the client. On appeal, the appellant asserted error as to the dismissal of the law firm. The court said that the firm's "liability under *respondeat superior* is vicarious, it does not exist apart from [the client's] liability. The jury held [the client] not liable, and the same result must, therefore, also obtain for [the law firm.]" *Id.* at 928–29.

Similarly, in *Morton v. Chesapeake & Ohio Railway Co.,* 184 W.Va. 64, 399 S.E.2d 464 (1990), the court found that a corporation was not liable for malicious prosecution, because the plaintiff's case was based upon the wrongful acts of an agent who had been dismissed from the case on directed verdict. Relying on *Willigerod v. Sharafabadi,* 151 W.Va. 995, 158 S.E.2d 175 (1967), the court reasoned:

Where a master and a servant are sued jointly in an action for recovery of damages resulting from personal injuries, if the action is based solely on the alleged tortious conduct of the servant, and he is, by a final judgment, acquitted of guilt of the tortious conduct alleged as a basis for the action, there can be no recovery thereafter against the master on the basis of such alleged cause of action.

*Morton,* 399 S.E.2d at 468.

In the tort context generally, numerous other decisions are to the same effect. *See, e.g., Roughton Pontiac Corp. v.*

*Alston,* 236 Va. 152, 372 S.E.2d 147, 149–50 (1988)(reversing judgment against employer for conversion, because jury exonerated employee); *Gangl v. Ford Motor Credit Co.,* 37 Mass. App.Ct. 561, 641 N.E.2d 709, 711 (1994)(reversing judgment against an employer because it was inconsistent with the jury's verdict exonerating the named employee); *Bausback v. K Mart Corp.,* 194 Ill.App.3d 325, 141 Ill.Dec. 223, 550 N.E.2d 1269, 1276 (1990) (reversing judgment against employer for battery because jury exonerated the named employee); *see also Greco v. University of Delaware,* 619 A.2d 900, 903 (Del.1993) ("[W]here the alleged basis for the liability of an employer is the negligence of an employee, 'the employer cannot be held liable unless the employee is shown to be liable.' "); *Moran v. North County Neurosurgery, Inc.,* 714 S.W.2d 231, 232–33 (Mo.Ct.App.1986) ("When verdicts are returned which inconsistently exonerate the servant and hold the master the proper remedy is to grant the employer a judgment notwithstanding the verdict."); *White v. Lovgren,* 222 Neb. 771, 387 N.W.2d 483, 485 (1986) ("[W]here there is no evidence that a master has been negligent other than through the imputation of the negligent conduct of his servant, based upon the doctrine of respondeat superior, as between the same parties, a judgment in favor of the servant on the merits renders invalid any judgment against the master."); *Willigerod,* 158 S.E.2d at 178 (recognizing the general rule that "where a master and servant are sued jointly in an action based solely on the tortious conduct of the servant, and the servant is acquitted, there can be no recovery against the master").

The foregoing authorities lead us to conclude that the verdict of liability against Southern cannot stand, given the jury's exoneration of the two individual employees, *if* the claim against Southern was based solely on the conduct of those two individuals. Southern contends that Taha did not assert or establish that any employees of Southern, besides McGovern and Wylie–Forth, committed the tort of malicious prosecution while acting in the scope of employment. Rather, appellant argues that Taha's position at trial was that McGovern and

Wylie–Forth were the only employees who engaged in the allegedly tortious conduct. Southern explains in its reply brief:

Since the jury found that Wylie–Forth [and McGovern] did not commit malicious prosecution, an appropriate question is whether there is evidence in the record that *other [Southern] employees*, namely Udit and Martinez, maliciously instigated a criminal proceeding against him without probable cause and within the scope of their employment.

[T]he jury could not base [Southern's] liability on the conduct of Udit and Martinez. The record is barren of any actionable evidence relating to these two employees which could form the factual predicate for the tort of malicious prosecution and, significantly, there is absolutely no evidence that it was within the scope of employment of Martinez and Udit to institute a criminal proceeding against Taha.

Southern adds: "The jury could not properly make a determination on scope of employment of Udit or Martinez, as Taha did not introduce evidence relating to any of the requirements set out by the Maryland Court of Appeals...."

Taha counters that Southern is liable based on conduct of Southern employees, other than McGovern and Wylie–Forth. Accordingly, we must resolve whether appellee sought to hold Southern liable based on the conduct of other employees of Southern, such as Udit and Martinez and, if so, whether the evidence was sufficient to permit the jury to find against Southern based on the conduct of other Southern employees who were not sued. This, in turn, requires us to examine appellee's theory of the case and the evidence adduced at trial.

As we noted, in order for Southern to be liable based on the conduct of other employees, apart from McGovern and Wylie–Forth, Taha had to produce some evidence from which a jury could find that the other employees committed the tort of malicious prosecution while acting within the scope of employment. *See Tall,* 120 Md.App. at 251, 706 A.2d 659. We first conclude that the jury was asked to decide whether

Taha was the victim of malicious prosecution based only on the conduct of McGovern and Wylie–Forth. We explain.

We are satisfied, based on the record, that appellee proceeded at trial on the theory that Southern was liable based on the conduct of McGovern and Wylie–Forth. In his opening statement, appellee's attorney stated:

> This is a very difficult case to comprehend as to what happens to a person when other people tell false things about you. I am not talking about liable [sic] or slander.

> I am talking about something that results in police coming to your house at night knocking on the door and saying, "Hello, is Mr. Taha here? We have reason to believe that you stole tools from Southern Management Corporation."

> \* \* \*

> *The police got involved because Deborah Wylie–Forth and Mr. McGovern, I believe, made up this story to hurt Mr. Taha in any way they could, and it hurt.*

(Emphasis added).

The jury instructions and the verdict sheet also demonstrate that appellee's claim against Southern was founded only on the conduct of McGovern and Wylie–Forth. As we noted, the court gave a brief supplemental instruction at appellee's request as to the tort liability of a corporation based on the conduct of its employees. There, it specifically mentioned Wylie–Forth and McGovern, and appellee never excepted or objected to the court's failure to broaden the instruction to cover other employees. Nor did Taha ask the court to expand the language in the special verdict form as it pertained to Southern, to make it clear that Southern's liability could rest on wrongdoing by any employee acting in the scope of employment. Based on the verdict sheet, it is quite likely that the jury believed that the only employees whose conduct it was to consider was that of Wylie–Forth and McGovern.

The closing argument of Taha's lawyer is also probative. There, his counsel said:

The Judge told you what the elements are which you need to come to in order to come to a verdict regarding malicious prosecution, and I think it is kind of common sense, you know. Somebody says you did a crime, and the police come and arrest you, and then the [case] gets dismissed, and there was no probable cause for their ever doing that.

In this situation, that occurred, and it is very difficult to understand their arguments for me because if they really wanted to say, "Look, we had probable cause for doing this," don't you think—I mean don't you think that you would have brought the two witnesses who they say spoke to the police?

The whole time they have been here they keep telling you, "We didn't do it." I mean, I put Deborah Wylie–Forth on in my case, which, as every attorney knows, you do not do that. The first words out of her mouth were "I didn't say that.". . . It is like you have been around some of the most seamy maybe side of human nature; that they would actually lie about a person to have the police come to their house.

\* \* \*

The result of doing this, of their words to a police officer engaged this police officer in this act that ended up with him being handcuffed in front of his house, in front of his neighbors, his good name, in front of his wife, in front of his daughter.

\* \* \*

If you have the two or three witnesses, for God's sake, bring them. I mean you are here spending your time. Why can't we bring the people who actually saw these events? Where did they suddenly disappear to? All these things you have been considering.

\* \* \*

And then the issue of Mr. McGovern. Mr. McGovern said he had somebody type out my words. I think it is obvious that those were not his words, and you can look at the memorandum and again the accusations that they were

stating against Mr. Taha, the accusations that he has committed criminal acts against his employer ... I thought he was trying to protect Southern Management Corporation ... [S]o that was very clear that he was getting his information from that man and from that woman regarding criminal activity.

In rebuttal, appellee's counsel argued:

[APPELLEE'S COUNSEL]: And again, I told you that [appellant's counsel] would be saying, "It is Martinez, and it is Oudit." [sic] They are both employed at—Ms. Oudit [sic] still works for them. She probably lives—

[APPELLANT'S ATTORNEY]: Your Honor, there is no evidence whatsoever to that fact at all.

THE COURT: Argue the facts in evidence, if you would, Counsel.

[APPELLANT'S ATTORNEY]: No evidence at all on that.

[APPELLEE'S COUNSEL]: No reason was given for their not being here if they wanted them to show this, none, and again, he is arguing the people that you should be mad at, that you should vent your juror discretion at are unknown assailants.

Based on all of the foregoing, we conclude that appellee proceeded against Southern for the tort of malicious prosecution based only on the conduct of McGovern or Wylie–Forth, not other Southern employees who were not sued. Therefore, the jury was not asked to consider Southern's liability based on the conduct of other employees. We have scoured the record and cannot find any instance when Taha told the jury that Southern should be found liable based on the statements to Grims made by employees of Southern who were not sued.

Even if appellee proceeded on the theory that, besides Wylie–Forth and McGovern, other Southern employees committed the tort, Taha would fare no better. This is because the evidence was not sufficient to establish wrongdoing by other corporate employees acting in the scope of employment. We explain.

Apart from the two employees who were sued and exonerated, Udit and Martinez were the only other Southern employees who were mentioned at trial in regard to the malicious prosecution claim. In order for a jury to have found Southern liable based on the conduct of Martinez or Udit, Taha had to prove tortious conduct by at least one of them *and* that the acts were undertaken within the scope of employment. *Tall,* 120 Md.App. at 251, 706 A.2d 659.

 The conduct of an employee is considered within the scope of employment if the conduct furthers the business of the employer and is authorized by the employer. *Sawyer v. Humphries,* 322 Md. 247, 255, 587 A.2d 467 (1991); *Lovelace,* 126 Md.App. at 682, 730 A.2d 774; *Tall,* 120 Md.App. at 251–52, 706 A.2d 659. As to scope of employment, the Court of Appeals has explained:

"To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master."

*Sawyer,* 322 Md. at 255, 587 A.2d 467 (quoting *East Coast Freight Lines, Inc. v. City of Baltimore,* 190 Md. 256, 285, 58 A.2d 290 (1948)).

 Moreover, an act incident to the performance of the duties entrusted to the employee by the employer qualifies as "authorized conduct." *Tall,* 120 Md.App. at 253, 706 A.2d 659. This is because " 'the master holds out his servant as competent and fit to be trusted . . . he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.' " *Oaks v. Connors, supra,* 339 Md. at 30, 660 A.2d 423 (quoting *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 580, 119 A.2d 423 (1956)). In contrast, an employee's actions are considered outside the scope of employment when

an employee's actions are *personal,* or where they represent a departure from the purpose of furthering the employer's

business, or where the employee is acting to protect his own interest, even if during normal duty hours and at an authorized locality. . . .

*Sawyer,* 322 Md. at 256–57, 587 A.2d 467 (emphasis added).

■ Proof that Martinez and Udit were employed by Southern is not enough to establish that their statements to Grims were made within the scope of employment. *See East Coast Lines,* 190 Md. at 285, 58 A.2d 290; *Rusnack v. Giant Food, Inc.,* 26 Md.App. 250, 261–62, 337 A.2d 445 (1975). Yet, our review of the record does not reveal any evidence relating to the job duties of either Udit or Martinez. Although there was some testimony that Martinez was a maintenance worker, there was no testimony about his actual responsibilities. Rather, the limited evidence in the record relating to Martinez established that he was a Southern employee who helped to move the heavy barrel that fell on Taha. *See Terra Nova Ins. Co. v. Chillum Corp.,* 71 Md.App. 552, 557, 526 A.2d 642, *cert. denied,* 311 Md. 22, 532 A.2d 168 (1987) (finding that theft was not the kind of conduct for which a supervisor/cashier was employed). As to Udit, there was no evidence at trial of her position, title, or job responsibilities.

In the light most favorable to Taha, Martinez reportedly told McGovern and Grims that he saw Taha shaking the lock of the maintenance shop while he was on disability. Martinez also told Grims that Taha had said he used to carry a handgun and had stabbed a person in New York City a few months ago. In the same light, the record reflects that Udit told Grims that she saw Taha enter Wylie–Forth's office while he was on disability. Moreover, Wylie–Forth testified that she allowed Grims to interview Southern's employees about the matter, explaining that, "at that time, everyone was a suspect." But, Wylie–Forth's statement was not an authorization to the employees to give false accounts to the police as to who may have committed the crime.

Moreover, the jury was not aware of the motives of Martinez and Udit in providing statements to the police about Taha's suspicious activity, and they conceivably could have

been acting to protect themselves. *See Sawyer*, 322 Md. at 256–57, 587 A.2d 467 (holding that an employee was acting outside the scope of his employment because his actions were purely for personal reasons and not incidental to any purpose of his employer). Additionally, the jury had no evidence from which it could determine if their statements were made during a period reasonably connected with their employment. While Grims testified that he spoke to both Martinez and Udit, he did not indicate when or where he talked to them. Nor did the evidence indicate that either employee was at work at the time that he or she spoke to Grims.

■ Again, we acknowledge the confusion that may have arisen from the inadequate supplemental jury instruction and the verdict sheet, which may have caused the jury to believe that it was entitled to find against Southern even if it found in favor of the individual defendants. Nevertheless, even if the confusion stemmed from the trial court's failure to instruct the jury fully with respect to respondeat superior,[7] and the jury was not clearly advised that Southern's liability was predicated and dependent upon a finding of wrongdoing by its employees, appellee did not quarrel with the adequacy of the supplemental instruction. Nor did appellee complain about the wording of the verdict sheet with respect to Southern; he did not ask the court to frame the question in such a way as to predicate Southern's liability on the basis of the conduct of *any* of its employees acting in the scope of employment. In the end, we cannot overlook appellee's failure to preserve for our review an issue concerning the adequacy of the jury instructions or the verdict sheet.

■ We are also of the view that, notwithstanding any deficiencies in the instructions or verdict sheet, a retrial is not appropriate as to Southern, because appellee could not proceed against Southern based on the conduct of Wylie–Forth and McGovern. As we noted, Wylie–Forth and McGovern are

---

7. The record extract contains Southern's proposed jury instructions, which include instructions concerning respondeat superior, but we have been unable to locate Taha's proposed instructions.

no longer parties, because the jury found in their favor, and Taha did not cross-appeal. Therefore, the issue of their personal wrongdoing has been finally litigated, and principles of res judicata and collateral estoppel bar a retrial as to them. Because appellee elected to proceed against Southern based only on the conduct of those two employees, there would be no basis for a respondeat superior claim against Southern.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.**